CORENSWET, INC., Plaintiff-Appellee,

v.

AMANA REFRIGERATION, INC., Defendant-Appellant.

Nos. 77–1538 and 77–3474.

United States Court of Appeals, Fifth Circuit.

April 30, 1979.

Rehearing and Rehearing En Banc Denied May 30, 1979.

Charles M. Lanier, New Orleans, La.,
John R. Carpenter, Stephen J. Holtman,
Cedar Rapids, Iowa, for defendant-appellant in both cases.

Robert E. Barkley, Jr., New Orleans, La., Bernard D. Craig, Jr., Michael B. Shteamer, Kansas City, Mo., for plaintiff-appellee in both cases.

Rutledge C. Clement, Jr., New Orleans, La., for defendant-appellant in 77–3474.

Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, La., Levy & Craig, Kansas City, Mo., for plaintiff-appellee in 77–3474.

Before WISDOM, AINSWORTH, and CLARK, Circuit Judges.

WISDOM, Circuit Judge:

Consolidated appeals in this diversity litigation[1] arise from the termination of a distributorship. Corenswet, Inc.[2], headquartered in New Orleans, has been an authorized, exclusive distributor of certain home appliances manufactured by Amana Refrigeration, Inc. ("Amana"). Corenswet sued to prevent Amana from terminating the relationship, on the ground that Amana's attempted termination was arbitrary and capricious. The district court found that the termination was arbitrary and was therefore in breach of the distributorship agreement as well as of the Uniform Commercial Code's general "good faith" principle. Amana challenges the district court's finding that the termination was arbitrary and without cause. We hold that the finding is not clearly erroneous. That is far from settling the dispute. The court issued a preliminary injunction forbidding the termination. No. 77–1538 is Amana's appeal from that ruling.

While that appeal was pending, Amana drew up a new standard form distributorship agreement, which limited the term of distributorships to one year. Corenswet, alone among Amana's distributors, refused to execute the new agreement, which it viewed as an attempt to circumvent the injunction. Amana responded with the contention that Corenswet's refusal to sign constituted just cause for terminating the distributorship. The district court agreed with Amana that Corenswet's refusal to sign the new contract would constitute cause for termination, but ruled that if Corenswet signed Amana could not refuse to renew the agreement at the end of any one-year term without good reason. Amana's appeal from that ruling is No. 77–3474.

The basic question at the heart of these appeals is whether Amana was entitled to terminate the distributorship arbitrarily. Amana assails the district court's interpretation of the contract to forbid an arbitrary termination, as well as the court's alternative rationale that the attempted termination is barred by the Iowa U.C.C.'s "good faith" principle. We hold that an arbitrary termination is permissible under both the contract and the law of Iowa. We reverse the district court's judgments.

I.

The primary facts are not disputed.

The plaintiff, Corenswet, Inc., is an independent wholesale distributor of appliances, dishware, and similar products. Since 1969 Corenswet has been the exclusive distributor of Amana refrigerators, freezers, room air conditioners, and other merchandise in southern Louisiana. Amana is a Delaware corporation domiciled in Iowa. Under the Amana system, products manufactured by Amana are sold to wholesale distributors such as Corenswet and to Amana's factory wholesale branches. The independent distributors and the factory branches then resell the merchandise to retail dealers who, in turn, sell to the public. The first distributorship agreement executed between Amana and Corenswet was of indefinite duration, but terminable by either party at any time "with or without cause" on ten days' notice to the other party. According

---

1. Under the contract and by stipulation of the parties the substantive law of Iowa controls.

2. In 1972 Select Brands Industries, Inc., a Missouri corporation, acquired Corenswet. Sam Corenswet remained as president and chief executive officer.

to the record, the agreement was modified twice, in 1971 and again in July 1975, before the institution of this lawsuit. The 1975 agreement modified the termination provision to allow termination by either party "at any time for any reason" on ten days' notice.

As is so often the case with franchise and distributorship relationships, the termination clause in the standard form contract was of little interest or concern to the parties so long as things were going well between them. At the hearing before the district court, Corenswet introduced testimony that it understood, in the early 1970's, that the relationship would be a lasting one, a relationship that would continue so long as Corenswet performed satisfactorily. According to Corenswet, it developed an organization for wholesale distribution of Amana merchandise: it hired a manager and salesmen for the line, as well as specially trained repairmen. Corenswet also expanded its physical plant. In all, Corenswet contended, it invested over $1.5 million over the period of 1969 to 1976 in developing the market for Amana products in the southern Louisiana area. The parties stipulated in district court that the annual sales of Amana products in the distributorship area increased from $200,000 in 1969 to over $2.5 million in 1976. The number of retail outlets selling Amana products in the area increased from six in 1969 to seventy-two in 1976. Corenswet, in short, developed an important new market for Amana products. And Amana became as important to Corenswet as Corenswet became to Amana: sales of Amana products as a percentage of Corenswet's total sales of all products swelled from six percent in 1969 to nearly twenty-six percent in 1976. Over the seven and one-half-year period, Amana representatives repeatedly praised Corenswet for its performance.

At the 1976 mid-year meeting of Amana distributors, however, George Foerstner, Amana's president, informed Corenswet that Amana would soon terminate its relationship with Corenswet because Corenswet was underfinanced. The parties agree that in early 1976 Corenswet had exceeded its credit limit with Amana, and that Amana at that time indicated that it might have to take a security interest in Corenswet's Amana inventory. According to a January communication from Amana, however, the "problem" was viewed by Amana as "a good kind of problem", reflecting, as it did, the growth of Corenswet's sales and hence purchases of Amana products. It is Corenswet's contention that the problem was not a serious one. Amana executives, the record reflects, assured Corenswet at the 1976 mid-year meeting that "satisfactory arrangements would be made" and that, Foerstner's statement notwithstanding, Corenswet would retain its distributorship.

There followed a complicated sequence of negotiations concerning Amana's security for credit extended. Amana sought a security interest in Corenswet's Amana inventory, to which Corenswet agreed. Amana asked also that Corenswet obtain more working capital from its parent corporation, Select Brands, Inc., as well as a bank letter of credit or line of credit. There is ample evidence in the record that Corenswet responded adequately to each Amana request, but that Amana persisted in changing its requirements as quickly as Corenswet could respond to its requests. In September, 1976, Corenswet met in New Orleans with Amana's representative, George Tolbert. Sam Corenswet, the company's president, informed Tolbert that Corenswet was ready and able to meet Amana's latest request: a $500,000 bank letter of credit. Tolbert relayed the information to Foerstner. Within a week Corenswet received a letter, prepared by Tolbert at Foerstner's direction, notifying Corenswet of its decision to terminate the distributorship because Corenswet was "unable to provide us with what we felt to be the minimum guarantees and/or security to sustain a continuing pattern of growth with Amana".

In October 1976 Corenswet filed suit for damages and injunctive relief in state court alleging that Amana had breached the distributorship agreement by terminating it arbitrarily. The reasons given by Amana for the termination, it contended, were pre-

textual. The state court issued a temporary restraining order barring termination. The TRO was retained in force after Amana removed the case to federal district court.

The district court conducted a three-day hearing on Corenswet's prayer for a preliminary injunction. The court concluded that Amana had indeed acted arbitrarily in deciding to terminate Corenswet. The record reflects that in early 1976, well before the mid-year distributor meeting, Amana began negotiating with another New Orleans concern, George H. Lehleitner & Co., about transferring its area distributorship to Lehleitner. The beginning of Amana's alleged concern over Corenswet's finances corresponded neatly with its Lehleitner negotiations. There was ample evidence in the record, moreover, to support the district court's conclusion that the real factor motivating Foerstner's decision was animosity towards Fred Schoenfeld, the president of Corenswet's parent corporation, Select Brands, Inc. That animosity dated back to 1972, when Schoenfeld's action in protesting to Raytheon Corporation, Amana's parent, aborted Amana's attempt to transfer the distributorship from Corenswet to Corenswet's then Amana sales manager.

The district court ruled that the arbitrary termination was a breach of the distributorship agreement. The court rejected Amana's argument that the termination clause, which permitted either party to terminate the contract "for any reason", permitted termination for any reason—be that reason good, bad, or indifferent. Although unwilling to accept Corenswet's position that the term "for any reason" imported a good or just cause limitation, the court ruled that the term means "for some reason, not for no reason . . . for something that appeals to the reason, to the mind, to the judgment, not for something that is arbitrary, capricious or wanton". In the alternative, the court ruled that the U.C.C.'s "good faith" principle, Iowa Code Ann. § 554.2103, forbids the bad faith termination of exclusive distributorships and found Amana's actions to have been in bad faith. The court issued the preliminary injunction

prohibiting Amana from terminating or attempting to terminate the relationship in November 1976.

In late 1977, Corenswet filed a declaratory judgment action in response to Amana's request that Corenswet sign the new standard form distributorship agreement. That civil action was transferred by the district judge to his section of the court. In September of 1977, Amana filed a motion requesting the court to modify or vacate the preliminary injunction to permit Amana to terminate the distributorship. Amana urged that Corenswet's refusal to execute the new distributorship agreement was sufficient cause or reason under the existing agreement and the injunction to justify termination of Corenswet's distributorship. The court denied Amana's motion, but amended the injunction to require Corenswet to execute the agreement within five days or suffer termination of the agreement, and to place restrictions on Amana's rights to refuse to renew the one-year term of the new agreement. The modification of the injunction, entered in November 1977, forbade Amana to refuse to renew the distributorship term "without reason" and enjoined Amana to accord Corenswet equal treatment with Amana's other distributors.

## II.

Amana appeals both the entry and the modification of the preliminary injunction. It contests the district court's interpretation of the contract and its view of applicable Iowa law and urges that even "bad faith" or "arbitrary" terminations are permitted by the contract and applicable law. Amana also argues that Corenswet failed to satisfy another requisite for issuance of a preliminary injunction: a showing that it would suffer irreparable harm in the absence of injunctive relief *pendente lite*. It further contends that the district court abused its discretion in issuing a preliminary injunction that requires specific performance of the contract because the injunction has the effect of requiring continuous court supervision of the parties' relationship.

In No. 77–3474 Amana urges that the court erred in failing to rule that Corenswet's post-injunction behavior was good cause for terminating the distributorship. Amana also contends that the court abused its discretion in granting Corenswet an extension of time for executing the agreement and by imposing restrictions on Amana's rights under the new agreement in advance of any conduct on its part giving reason to believe that it would arbitrarily refuse to renew the new agreement at the expiration of its one-year term.

■ With the exception of the point that the injunction has the effect of forcing these antagonistic parties to maintain their relationship indefinitely and requiring the continuous supervision of the district court,[3] we find little merit in the appellant's attacks on the district court's exercise of its discretion in modifying the injunction. If the district court's view of the contract and the law were correct, we would lack any basis for disturbing the court's modification of the injunction. In general, an appeals court's deference to the trial court's discretion is at its height when litigants challenge that court's administration of its own decrees in equity. Following the entry of the original injunction, the district court, faced with what could justifiably be viewed as an attempt by Amana to circumvent the court's command that it not terminate Corenswet without cause, did Amana a good turn, it seems to us, by permitting Amana, subject to a good cause limitation on its non-renewal rights, to put Corenswet, like all its other distributors, under the new distributorship agreement. Under the court's original ruling Amana had no right to terminate the old contract unilaterally, a contract which was of indefinite duration and terminable, in the district court's view, only for reason. It was no abuse of discretion of the court to accommodate Amana's interest in keeping all of its distributors under a single form of contract in such a way as to preserve Corenswet's rights, as the court viewed them, under the first contract.

Because there was nothing improper in the court's modification of the preliminary injunction (assuming that the injunction was properly issued in the first place) we turn to the issues raised in No. 77–1538.

■ Amana asserts that the district court erred in construing the contract's termination clause to prohibit unilateral termination of the distributorship except for some "reason" that appeals to the mind. The contractual language "for any reason", it argues, was intended to remove all limitations upon the exercise of the termination power. Because the district court looked to extrinsic evidence in construing the contract its interpretation is, under Iowa law, treated as a factual one. *Allen v. Highway Equipt. Co.*, Iowa, 1976, 239 N.W.2d 135, 139. Amana, therefore, has the burden of persuading us that the court's interpretation was clearly erroneous. *E. g., Griffin v. Missouri Pacific R.R. Co.*, 5 Cir. 1969, 413 F.2d 9; *United States for Use and Benefit of Citizens Nat. Bank v. Stringfellow*, 5 Cir. 1969, 414 F.2d 696; Fed.R.Civ.P. 52(a).

In assessing the district court's interpretation of the contract we must look to the appropriate rules of construction found in applicable state law—in this case, as the parties have stipulated, the law of Iowa. Although most distributorship agreements, like franchise agreements, are more than sales contracts, the courts have not hesitated to apply the Uniform Commercial Code to cases involving such agreements. *E. g., Rockwell Engineering Co. v. Automatic Timing & Controls Co.*, 7 Cir. 1977, 559 F.2d 460; *Aaron E. Levine & Co. v. Calkraft Paper Co.*, 1976, E.D.Mich., 429 F.Supp. 1039; *Baker v. Ratzlaff*, 1976, 1 Kan.App.2d 285, 564 P.2d 153. We therefore look to the constructional rules of the Code, as adopted by Iowa, chapter 554 of the Iowa Code.

---

**3.** [D]ifficulty of enforcement is, in itself, often a sufficient reason for denying injunctive relief. [citations omitted]. The Court should not be called upon to weld together two business entities which have shown a propensity for disagreement, friction, and even adverse litigation.

*Refrigeration Engineering Corp. v. Frick Co.*, 1974, W.D.Tex., 370 F.Supp. 702, 715.

The starting point under the Code is the express terms of the agreement. U.C.C. §§ 1–205, 2–208(2); Iowa Code Ann. §§ 554.1205, 554.2208(2). Under the contract, Amana was free to terminate the relationship "at any time and for any reason". The district court did not expressly rely on record evidence concerning the parties' understanding or the common understanding of the term "any reason" in concluding that the term means "something that appeals to the reason, to the mind". In the common understanding, it seems to us, the phrase "for any reason" means "for any reason that the actor deems sufficient". The phrase, that is, is ordinarily used not to limit a power, but to free it from implied limitations of "cause". That this is the intendment of the phrase becomes all the more clear when it is read in conjunction with the immediately preceding phrase "at any time". That phrase plainly frees the termination power from limitations as to timing. The exact parallelism of the two phrases reinforces the interpretation of the "any reason" language as negating any limitations whatsoever. In Webster's New International Dictionary (2d Ed.1939) the first definition of reason is "An expression or statement offered as an explanation of a belief or an assertion or as a justification of an act or procedure." The second of nine definitions given for the word is "a ground or a cause; that in the reality which makes any fact intelligible". Id. We consider that this is the usual sense of the word when used in the phrase "for any reason".[4]

The district court's interpretation is understandable in view of Amana's vacillation about the meaning of the contract term. When pressed by the district court to explain Amana's position, one of Amana's attorneys stated: "I think it's Amana's position that 'For any reason' means some reason." He went on to add, however, that he thought the term meant the same thing as "with or without cause". When the judge then commented that he thought the attorney was taking a contradictory position, the attorney explained that "any reason" would include a bad reason. When the judge observed that in his opinion a fictitious reason would be no reason at all, the attorney agreed. Later, another Amana attorney stated that it was Amana's position that it did not need a "good reason" or a "legitimate reason" for terminating the contract. To the court's query whether he then disagreed that Amana needed "some reason" the attorney replied that he did not.

We think that these joustings with the bench over semantics, at the conclusion of the hearing and after the evidence had been received, form too slim a reed to support the court's interpretation of the contract term. Amana never conceded that it needed a justification, in the sense of a reason grounded in Corenswet's conduct, for ending the relationship. Even if it is assumed that Amana needed "some reason" to terminate the contract, that reason is supplied by its evident desire to give the New Orleans distributorship to the Lehleitner company, just as we think that Corenswet would, under the contract, be entitled to terminate the relationship by reason, to take an example, of its wish to handle Kelvinator, rather than Amana, products.

There is no evidence in the record that the parties understood the phrase otherwise. There is testimony that Corenswet officials "understood" that the contract

**4.** Indeed, Corenswet uses the word in this sense in its brief when it urges that "the real reason [for the termination] was because Mr. Foerstner wanted it."

Corenswet cites, in support of the district court's construction, the case of *Dubois v. Gentry,* 1945, 182 Tenn. 103, 184 S.W.2d 369, in which the Tennessee Supreme Court ruled that the term "for any reason" in a termination clause "should be construed to mean 'any good reason or just reason'." *Id.* 184 S.W.2d at 371. The court, however, was not making a factual determination. Rather, it was ruling that the law of the state implies a "just reason" limitation. The question that we are addressing at this point in the opinion is a question of fact. If judicial authority is of aid on this point, we note that the Iowa Supreme Court has used the term "for any reason" to mean the same thing as "at will". *Harper v. Cedar Rapids Television Co., Inc.,* Iowa, 1976, 244 N.W.2d 782, 791 ("The contract being terminable at will, plaintiff could have been discharged for virtually any reason.").

would not be terminated arbitrarily. That, however, is evidence not of Corenswet's understanding of the termination clause as written, but of its expectations about Amana's behavior—that is, its belief that Amana would never use the termination language to Corenswet's detriment. Corenswet has made much of certain testimony given by Amana's president, George Foerstner. Foerstner testified that Amana does "not cancel a distributor without a reason, without a good reason". When asked whether Amana then needed a reason to cancel Corenswet, Foerstner replied: "We needed a reason, yes, but we do not cancel distributors without a reason". This, too, we take not to be evidence of an understanding of the written contractual provision at issue, but as evidence of Amana's usual practice or, at best, of Amana's understanding of how it ought to treat its distributors. The questions posed to Foerstner did not direct his attention to the written contract, much less to the disputed clause. The district court, significantly, did not in its opinion advert to the Foerstner testimony.[5]

▪▪▪▪ We take Corenswet to be arguing that the contractual language must be interpreted in light of Amana's historical treatment of Corenswet and its other distributors. Although Amana's past dealing with Corenswet does not fit the Code categories of sources relevant to contract interpretation—usage of trade, course of dealing, and course of performance[6]—we may assume that it is a source sufficiently similar to the Code categories to be relevant in construing the contract. Courses of commercial conduct "may not only supplement or qualify express [contract] terms, but in

appropriate circumstances may even override express terms". J. White & R. Summers, *Handbook of the Law under the Uniform Commercial Code* § 3–3 at 84 (1972). The Code commands that express contract terms and "an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other". U.C.C. § 1–205, Iowa Code Ann. § 554.1205; *see also* U.C.C. § 2–208(2), Iowa Code Ann. § 554.2208(2). In this case, however, no reasonable construction can reconcile the contract's express terms with the interpretation Corenswet seeks to glean from the conduct of the parties. The conflict could not be more complete: Amana's past conduct, with regard both to Corenswet and to its other distributors, may have created a reasonable expectation that Amana would not terminate a distributor arbitrarily, yet the contract expressly gives Amana the right to do so. We can find no justification, except in cases of conduct of the sort giving rise to promissory estoppel, for holding that a contractually reserved power, however distasteful, may be lost through nonuse. The express contract term cannot be construed as Corenswet would constitute it, and it therefore controls over any allegedly conflicting usage or course of dealing. U.C.C. §§ 1–205, 2–208(2), Iowa Code Ann. §§ 554.1205, 554.2208(2).[7]

The district court's alternative rationale was that arbitrary termination of a distributorship agreement contravenes the Code's general obligation of good faith dealing. Section 1–203 states: "Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement". Iowa Code Ann. § 554.1203. The good faith obligation is one of those obliga-

---

5. At the hearing Foerstner, as he did throughout the period just prior to the termination, attempted to put a reasonable face on an act that was arbitrary in the sense that it was largely motivated by personal reasons.

6. *See* U.C.C. § 1–205(2) (defining usage of trade); § 1–205(1) (defining course of dealing), § 2–208(2) (defining course of performance).

7. Corenswet's complaint also alleged the existence of an oral agreement or an oral modification of the existing agreement. The district

court did not address this point in the preliminary injunction opinion. The injunction cannot be sustained on the ground that Corenswet is likely to prevail on the merits of this claim. The hearing produced little evidence to support this allegation and produced no proof of the validating "writing" evidencing such an agreement that is required by sections 2–201 and 2–209 of the Code for maintaining a claim or defense based on an oral contract or modification.

tions that section 1–102 of the Code says "may not be disclaimed by agreement". Iowa Code Ann. § 554.1102(3). As courts and scholars have become increasingly aware of the special problems faced by distributors and franchisees, and of the inadequacy of traditional contract and sales law doctrines to the task of protecting the reasonable expectations of distributors and franchisees, commentators have debated the utility of the Code's general good faith obligation as a tool for curbing abuse of the termination power. *See, e. g.,* E. Gellhorn, *Limitations on Contract Termination Rights—Franchise Cancellations,* 1967 Duke L.J. 465; Hewitt, *Good Faith or Unconscionability—Franchise Remedies for Termination,* 29 Bus.Law 227 (1973).

The courts of late have begun to read a good faith limitation into termination clauses of distributorship contracts that permit termination without cause. *E. g., Randolph v. New England Mutual Life Ins. Co.,* 6 Cir. 1975, 526 F.2d 1383 (Ohio law); *de Treville v. Outboard Marine Corp.,* 4 Cir. 1971, 439 F.2d 1099 (South Carolina law); *Tele-Controls, Inc. v. Ford Industries, Inc.,* 7 Cir. 1967, 388 F.2d 48 (Oregon law); *Baker v. Ratzlaff,* 1976, 1 Kan.App.2d 285, 564 P.2d 153. Of the cited cases, however, only the *Baker* case relies squarely on the Code. The *Randolph, de Treville,* and *Tele-Controls* cases rested chiefly on state law doctrines that antedated the adoption of the Code.[8]

In similar cases other courts have held that agency or distributorship contracts of indefinite duration are terminable by either party with or without cause. *E. g., Rockwell Engineering Co. v. Automatic Timing*

*& Controls Co.,* 7 Cir. 1977, 559 F.2d 460 (Indiana law); *Aaron E. Levine & Co. v. Calkraft Paper Co.,* 1976, E.D.Mich., 429 F.Supp. 1039 (Michigan law). Those courts have relied on section 2–309(2) of the Code, which states:

Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

Iowa Code Ann. § 554.2309(2). The division in the authorities, then, is between those courts that hold that the Code's general good faith obligation overrides the specific rule of section 2–309(2) as applied to distributorship or franchise agreements, and those that give precedence to section 2–309.

The parties have not cited and we have not found Iowa cases on the issue decided under the Uniform Commercial Code. The Iowa case law on this question is pre-Code and follows the common law rule, which is essentially the rule of section 2–309 as applied to distributorship contracts. In *Des Moines Blue Ribbon Distributors, Inc. v. Drewrys Limited, U. S. A., Inc.,* 1964, 256 Iowa 899, 129 N.W.2d 731, the Iowa Supreme Court held that an exclusive distributorship contract of indefinite duration may be terminated without cause only upon reasonable notice. Although the plaintiff in that case did not, so far as appears from the opinion, claim the right not to be terminated without cause, the court's treatment of the issues raised makes it clear that the requirement of reasonable notice was thought by the court to be the only restriction on the manufacturer's right to cancel the agreement.[9]

---

8. The Pennsylvania Supreme Court has recently held that the Code's good faith provision bars termination without cause of a gasoline dealership even after the dealer service station lease has expired. *Atlantic Richfield Co. v. Razumic,* 1978, 480 Pa. 366, 390 A.2d 736; *Kowatch v. Atlantic Richfield Co.,* 1978, 480 Pa. 388, 390 A.2d 747. The court emphasized, however, that Arco's contract with the dealers contained no provision giving Arco the right to terminate the relationship at will. *Atlantic Richfield Co. v. Razumic,* 390 A.2d at 741.

9. At one point in its opinion the *Drewrys* court seemed to add another limitation: that the agreement must continue in force for a reasonable time. 129 N.W.2d at 736. This is the so-called "Missouri doctrine", a hardship rule of agency law designed to give an agent a reasonable time in which to recoup his original investment in the agency. *See generally* E. Gellhorn, *supra,* at 479–483. The *Drewrys* court did not face a claim based on insufficient duration, so its "adoption" of the Missouri doctrine is dictum. Even assuming that the doctrine is indeed law in Iowa, it has no applica-

Because the *Drewrys* case preceded Iowa's adoption of the Uniform Commercial Code, *Erie* does not strictly bind us to that decision. The Code added to Iowa commercial law a statutory good faith obligation. The Iowa law reflected in the *Drewrys* decision has been criticized for treating "what are essentially franchise agreements" as "a series of executory contracts enforceable only if performance has commenced". E. Gellhorn, at 469, n.15. On the other hand, in an area such as this, where considerations of *stare decisis* are of importance, we should hesitate to depart from established case authority absent fair assurance that the state's courts would interpret the Uniform Commercial Code to forbid "bad faith" or "arbitrary" terminations of distributorship contracts. Unlike the federal courts in the *Randolph, de Treville,* and *Tele-Controls* cases, we are not facing the termination issue against the backdrop of existing state law doctrine that forbids arbitrary terminations.

 We are not persuaded that the adoption of the Code has effected any change in Iowa law with regard to distributorship terminations. We do not agree with Corenswet that the section 1–203 good faith obligation, like the Code's unconscionability provision, can properly be used to override or strike express contract terms. According to Professor Farnsworth, "[T]he chief utility of the concept of good faith performance has always been as a rationale in a process . . . of implying contract terms . ..'" Farnsworth, *Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code,* 30 U.Chi.L.Rev. 666, 672 (1963). He defines the Code's good faith obligation as "an implied term of the contract requiring cooperation on the part of one party to the contract so that another party will not be deprived of his reasonable expectations". *Id.* at 666. When a contract contains a provision expressly sanctioning termination without cause there is no room for implying a term that bars such a termination. In the face of such a term there can be, at best, an expectation that a party will decline to exercise his rights.[10]

 As a tool for policing distributorship terminations, moreover, the good faith test is erratic at best. It has been observed that the good faith approach

is analytically unsound because there is no necessary correlation between bad motives and unfair terminations . . ..
The terminated dealer seeks relief against the harsh effects of termination which may be unfairly placed on him, not against the manufacturer's ill will.

E. Gellhorn, *supra,* at 521. The better approach, endorsed by Professor Gellhorn, is to test the disputed contract clause for unconscionability under section 2–302 of the Code. The question these cases present is whether public policy forbids enforcement of a contract clause permitting unilateral termination without cause. Since a termination without cause will almost always be characterizable as a "bad faith" termination, focus on the terminating party's state of mind will always result in the invalidation of unrestricted termination clauses. We seriously doubt, however, that public policy frowns on any and all contract clauses permitting termination without cause. Such clauses can have the salutary effect of permitting parties to end a soured relationship without consequent litigation. Indeed

tion to this case. The reasonable duration envisioned by the doctrine is quite short, *see* E. Gellhorn, *supra,* at 482; *Bushwick-Decatur Motors, Inc. v. Ford Motor Co.,* 2 Cir. 1940, 116 F.2d 675; and the minimum duration requirement may be eliminated contractually. E. Gellhorn, *supra,* at 482, and authorities cited in 482 nn.62 & 63.

10. Furthermore, the proposition that the Code's good faith obligation cannot be disclaimed must be qualified. Section 1–102(3) of the Code, which provides that the obligation of

good faith is not disclaimable, goes on to state that "the parties may by agreement determine the standards by which the performance of such obligation is to be measured if such standards are not manifestly unreasonable." It could be argued that even if arbitrary termination of a distributorship under an agreement silent as to grounds for termination would be in "bad faith", section 1–102(3) nevertheless permits the parties to the contract to stipulate that termination "without cause" or "for any reason" is not in bad faith.

when, as here, the power of unilateral termination without cause is granted to both parties, the clause gives the distributor an easy way to cut the knot should he be presented with an opportunity to secure a better distributorship from another manufacturer. What public policy does abhor is economic overreaching—the use of superior bargaining power to secure grossly unfair advantage. That is the precise focus of the Code's unconscionability doctrine; it is not at all the concern of the Code's good faith performance provision. It is the office of the unconscionability concept, and not of the good faith concept, to strike down "unfair" contract terms.[11]

 We conclude that, under the better view, the Code does not *ipso facto* bar unilateral arbitrary terminations of distributorship agreements, and that Iowa's adoption of the Code therefore left undisturbed the law reflected in the *Drewrys* decision.

### III.

It follows from what we have said that the preliminary injunction was erroneously entered. The evidence brought out at the hearing in the district court did not demonstrate that Corenswet was likely to succeed on the merits of its claim. The contract expressly permitted Amana to terminate Corenswet's distributorship without cause. Iowa law, we have held, does not prohibit or bar the enforcement of contract clauses permitting termination without cause, ex-

cept in cases of unconscionability. Although Corenswet alleged in its complaint that the contract term was unconscionable, it never pressed that issue, and the district court made no finding in that regard, as indeed it could not on the state of the record.[12]

Corenswet's rights with respect to termination extend only to a right to notice. The Amana contract permits termination on ten days' notice. Under the Code, section 2–309(3), and under the *Drewrys* case, however, a distributor is entitled to reasonable notice. Section 2–309(3) of the Code states that "an agreement dispensing with notification is invalid if its operation would be unconscionable." But any claim that Corenswet might have based on inadequate notice would not entitle Corenswet to injunctive relief, for it appears from the *Drewrys* case and from *C. C. Hauff Hardware, Inc. v. Long Mfg. Co.,* 1965, 257 Iowa 1127, 136 N.W.2d 276, that the manufacturer's failure to give proper notice is adequately remediable at law.

The district court's decisions are REVERSED, and the preliminary injunction is VACATED.

---

11. The leading case applying the unconscionability doctrine to bar arbitrary termination of a dealership is *Shell Oil Co. v. Marinello,* 1973, 63 N.J. 402, 307 A.2d 598.

12. Sometime between Corenswet's filing of the lawsuit and the hearing on whether to issue a preliminary injunction the unconscionability issue dropped from the case. The issues for the hearing were narrowed to include only the meaning of the contract and the reasons for Amana's termination of Corenswet. To prevail on a theory of unconscionability Corenswet would have to demonstrate (1) that it had no "meaningful choice" but to deal with Amana and accept the contract as offered, and (2) that the termination clause was "unreasonably favorable" to Amana. *Williams v. Walker-Thomas Furniture Co.,* 1965, 121 U.S.App.D.C.

315, 319, 350 F.2d 445, 449; *see also* E. Gellhorn, *supra,* at 510–513. The record evidence relevant to these questions is scanty. Sam Corenswet testified that Amana in 1969 aggressively sought Corenswet as a distributor and that he only reluctantly decided to commit his company to Amana. Another Corenswet witness, at one point in his testimony, said of the 1975 amended contract that, in view of Corenswet's heavy investment in the Amana line, "we had to take it." The court interrupted that testimony and expressed its view that it was irrelevant to the hearing issues. There was no other evidence regarding the parties' relative bargaining power at the time the relationship began, nor any evidence as to the relative usefulness of the termination clause to the two sides.