United States Court of Appeals,

Fifth Circuit.

Nos. 94-60614, 95-60255.

MCDONALD'S CORPORATION, Plaintiff-Appellee,

v.

Joe L. WATSON and Lashon Enterprises, Inc., Defendants-Appellants.

Nov. 17, 1995.

Appeals from United States District Court for the Southern District of Mississippi.

Before POLITZ, Chief Judge, and WISDOM and STEWART, Circuit Judges.

STEWART, Circuit Judge:

This is a contract case in which the district court granted partial summary judgment in favor of plaintiff McDonald's Corporation, holding that the defendants, Joe L. Watson and Lashon Enterprises, infringed McDonald's trademark between the date McDonald's served its complaint on the defendants and the date the defendants surrendered the McDonald's restaurants. The district court also enjoined the defendants from interfering with the operations of the restaurants and submitted the issue of damages to the jury. The jury awarded McDonald's $45,946.00 in compensatory damages and attorneys' fees based on its claims that the defendants breached their franchise agreement and infringed McDonald's trademark. The district court subtracted the $30,000.00 security deposit McDonald's held and entered judgment in favor of McDonald's in the amount of $15,946.00. The defendants have filed two separate appeals, which have been consolidated, challenging the partial summary judgment, the injunction, declaratory judgment and the resulting damages. Because we are convinced that the district court did not err with respect to the disposition of any of the issues raised on appeal, we AFFIRM the judgment in favor of the plaintiff, McDonald's.

*FACTS*

Joe Watson and Lashon Enterprises, the defendants/appellants in both appeals, operated two McDonald's franchise restaurants in Carthage and Canton, Mississippi under separate, but identical,

pre-printed licensing agreements[1] (the "Agreement") with the plaintiff/appellee, McDonald's Corporation. The Agreement authorized the defendants "to adopt and use ... the [McDonald's] trade names, trademarks and service marks" on the condition that they complied with the obligations specified in the Agreement. Almost from the beginning of their operation, Watson and Lashon experienced financial difficulties and were unable to honor their financial obligations to McDonald's in a timely fashion.

Unfortunately for the defendants, the McDonald's Agreement did not tolerate untimely payments from franchisees/licensees. The Agreement listed several situations that constituted material breaches which would give McDonald's the option to terminate the Agreement. Several occurrences specifically addressed the Licensee's financial health and specifically denounced untimeliness of payments to McDonald's, judgment creditors, the IRS, or suppliers. Those provisions stipulated that a material breach occurred (1) when the Licensee becomes insolvent, (2) when the Licensee fails to pay any service fee owed to McDonald's within thirty days after the date the payment is due, (3) when any judgment(s) aggregating more than $5,000 have been rendered against the Licensee, (4) when any federal, state, or local tax lien totaling over $5,000, which has been placed against Licensee's property, remains unsatisfied or unbonded for more than thirty days, or (5) when the Licensee "fail[s] to make or ... delays [repeatedly] in the prompt payment of undisputed invoices from his suppliers or in the remittance of rent and service fees[.]" The Agreement also specified the means through which McDonald's had to give notice of termination if it opted to terminate a franchise. The notice provision read as follows:

> *Notices.* Any notice hereunder shall be in writing and shall be delivered by personal service or by United States certified or registered mail, with postage prepaid, addressed to Licensee at the Restaurant....

On three occasions between July 1991, and December 1992, McDonald's sent letters, titled "Notice of Default/Termination," to the defendants demanding payment of overdue obligations and

---

[1]There were three separate agreements: a general trademark agreement and two referenced and incorporated supplemental agreements providing for operating and trademark licenses. All of the agreements are interrelated and termination of one agreement terminated the other two agreements. Thus, they will be considered *in globo* for purposes of this appeal.

further warning the defendants that if they did not stay current on their payments, the franchise agreement would be terminated. The defendants always paid the overdue charges within the times allowed in the demand letters, but generally failed to stay current afterwards. By January 5, 1993, McDonald's decided to terminate the franchise agreement. Although there were numerous oral communications between the parties, McDonald's did not send a written notice of the termination to the defendants. McDonald's apparently believed that the eighteen months of correspondence, including several demand letters sent prior to filing of suit, had provided sufficient notice.[2]

On March 8, 1995, McDonald's filed a complaint in the United States District Court for the Southern District of Mississippi, alleging that the franchise agreement between the parties had been terminated as of January 5, 1993. McDonald's alleged numerous breaches of the Agreement and the existence of several tax liens against the defendants' restaurants. The complaint sought the surrender of the two restaurants, an injunction against further interference by the defendants, and damages for trademark infringement, rents, service fees, repair costs, and attorneys' fees.

The defendants received the complaint via personal service on March 15, 1993. The complaint specifically said that the franchises were terminated. In Watson's deposition, he testified that he believed the complaint reflected McDonald's position that the franchises had been terminated. However, the complaint was not addressed or sent to either restaurant, and the complaint was not preceded by a demand letter. Thus, despite the filing of the complaint, the defendants continued to sell products from the McDonald's restaurants using the McDonald's name and trademark.

At the time the suit was filed, another suit regarding the two franchises was pending in Mississippi state court. That suit was one of several filed against the defendants by OPNAD Fund,

---

[2]The demand letters provided a deadline for payment and explicitly warned as follows: "If you fail to timely cure this default, then your Franchises will automatically terminate at 12:01 a.m. E.S.T...., without further notice to you or action on our part." The letters also warned that the failure to remain current during the next twelve month period would result in termination of the franchise without further notice, and that McDonald's would then apply to the court to reacquire the premises and obtain relief. Moreover, the last letter from McDonald's corporate attorney to the defendants' counsel, dated February 15, 1993, noted that "[w]e further remind you that McDonald's asserts that your clients' franchises for the McDonald's restaurants ... were automatically terminated on January 5, 1993. Your clients did not cure the Notice of Default, dated December 1992."

an organization formed and controlled by McDonald's for the purpose of providing national advertising for the chain. OPNAD sought payment of fees owed by the defendants. The defendants filed a counterclaim against McDonald's in that suit, alleging that McDonald's was responsible for the defendants' financial difficulties. McDonald's answered the counterclaim but did not assert any additional claims against the defendants.

The defendants filed a motion in federal district court asserting that the federal case should be either stayed or dismissed because the claims asserted in it by McDonald's should have been raised in the state court case in a compulsory counterclaim. The district court denied their motion holding that the two cases were not identical.

On March 22, 1993, the defendants surrendered the Carthage restaurant back to McDonald's, and on March 29, 1993, the defendants surrendered the Canton restaurant to the Internal Revenue Service.

In April 1993, the defendants filed a motion for summary judgment asserting that McDonald's never gave the defendants an effective notice of termination, as required by their licensing agreement, and they therefore could not have infringed the McDonald's trademark. The district court initially agreed, finding that neither the demand letters nor the other communications between the parties met the notice of termination requirements of the Agreement. The district court concluded further that the Agreement had never been terminated, and no use of the McDonald's mark had been unauthorized. On McDonald's motion for reconsideration, however, the district court reversed itself, holding that the complaint served as notice and was effective against the defendants immediately upon service.[3]

The district court later determined that McDonald's terminated the Agreement for cause because the defendants materially breached the Agreement. First, the IRS issued a tax lien against

---

[3]When reviewing this issue during its initial consideration, the district court misread the general notice provision as requiring (1) documents addressed to the Licensee at the restaurant *AND* (2) delivery by personal service or service by certified or registered mail. On reconsideration, the court appropriately read the address requirement as necessary for the mail service method, but not necessary for the personal service method. Thus, personal service of the complaint on the defendants accomplished notice regardless of where the service occurred.

Lashon on September 22, 1992 in the amount of $5,653.01, and on December 9, 1992 it issued another tax lien against Watson in the amount of $30,069.24. Neither tax lien had been released, bonded or paid as of the date the district court rendered its judgment. Further, Watson had a civil judgment totaling $69,898.32 rendered against him on May 1, 1992. Although McDonald's knowingly waived previous breaches by expressly allowing the defendants to cure the breaches by paying the debts by a specified deadline, McDonald's did not know of the tax lien breaches when it accepted the defendants' January 4, 1993 payment. Further, the Agreement did not obligate McDonald's to provide the defendants an opportunity to cure the tax lien breach. Therefore, the district court held that McDonald's did not waive its rights regarding the tax lien breaches, and that McDonald's terminated the Agreement for cause.

On the basis of these rulings, the district court then granted partial summary judgment to McDonald's, holding that the defendants infringed on McDonald's trademark between the date the complaint was served and the dates that the defendants surrendered the two restaurants. The district court also enjoined the defendants from interfering with the operations of the Canton and Carthage franchises.

On March 6-8, 1995, the district court held a jury trial to determine McDonald's damages. Because the district court offset the $45,946.00 jury award by the $30,000.00 security deposit held by McDonald's, McDonald's received a final judgment of $15,946.00. The defendants appealed.

*DISCUSSION*

I. *THE FIRST APPEAL*

In the first of two separate appeals which have been consolidated, the defendants challenge the district court's finding that the complaint served as adequate notice of termination under the terms of the franchise agreement. They also appeal the ruling that the termination was effective immediately upon service of the complaint, and contest the grant of injunctive relief.

A. *NOTICE OF TERMINATION*

The district court granted partial summary judgment in favor of McDonald's holding that the complaint served as adequate notice of termination of the Agreement. We review the partial grant

of summary judgment under the parameters established by rule 56 of the Federal Rules of Civil Procedure. Rule 56 governs the propriety of summary judgment. Summary judgment shall be granted if the record, taken as a whole, "together with the affidavits, if any, show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. We review the district court's summary judgment de novo. *Lee v. Wal-Mart Stores, Inc.,* 34 F.3d 285, 288 (5th Cir.1994). However, we resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy; that is, when both parties have submitted evidence of contradictory facts. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

This case does not involve a factual controversy. It is undisputed that the defendants engaged in activities that constituted material breaches of the Agreement, for which McDonald's could terminate the Agreement. Instead, the issue is whether the terms of the Agreement allowed McDonald's to terminate the franchises merely by personally serving a complaint on the defendants or whether the Agreement required McDonald's, prior to filing suit for trademark infringement, to send notice of termination in a separate document containing the signature of a McDonald's officer or its licensing director. We must review this legal issue de novo.

The defendants argue that Illinois contract law requires exact compliance with contractual provisions regarding both form and method of service in order for McDonald's to effect notice of termination. The defendants do not contest the district court's conclusion that McDonald's demonstrated "exact compliance" with the service requirement by personally serving the defendants with the complaint. However, the defendants contend that McDonald's did not "exactly" comply with the form requirements because it was not signed by an officer or the licensing director. In a section entitled "Scope and Modification of License," the Agreement provides as follows:

> The License (including any appendices hereto) constitutes the entire agreement between the parties and supersedes all prior and contemporaneous, oral or written, agreements or understandings of the parties. *No interpretation, change, termination or waiver of any of the provisions hereof shall be binding upon the Licensor unless in writing signed by an officer of the Licensor or its Licensing Director.* No modification, waiver, termination, rescission, discharge or cancellation of this License shall affect the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to date of such modification, waiver, termination, rescission, discharge or cancellation.

The defendants claim that the "Modification" requirements applied to the form requirements for the entire contract; however, at a minimum, the "Modification" provision applied to termination of the specific provision regarding the conveyance of the license to use the trademark or trade name "McDonald's."

By contrast, McDonald's contends that exact compliance is not necessary. Further, McDonald's maintains that the "Modification" provision is an integration clause that relates only to changes in the License or its provision; it has nothing to do with termination of the entire contract.

The district court concluded that Illinois law does require exact compliance with contractual provisions regarding notice of termination. The district court, citing *McCann v. Frank B. Hall & Co.,* 609 F.Supp. 627, 629, *vacated on other grounds,* 624 F.Supp. 98 (N.D.Ill.1985), explained as follows: "There must be *exact* compliance with the terms of the provision for notice." (Emphasis in original). On reconsideration, the court concluded that personal service of the complaint on the defendants complied exactly with the notice of termination provision articulated in the Agreement.

Our review of Illinois law indicates that Illinois law is not settled on the issue of whether "exact" compliance is indeed necessary or whether compliance is satisfied when the party receives actual notice although served via a method other than the one imposed in the Agreement.[4] In any event, we need not decide whether Illinois law requires exact compliance because we agree with the district court that McDonald's complied exactly with the notice provision articulated in the Agreement. The Agreement requires only two things to effectuate notice of termination: (1) a written statement of termination, and (2) service of this written statement either by personal service

---

[4]*Compare McCann v. Frank B. Hall & Co.,* 609 F.Supp. 627, 629 (N.D.Ill.1985) (when ruling that oral notice was insufficient to cancel the contract, the court explained: "it is a general rule of contract construction which specifies that the requirements of a contract as to notice, as to the time of giving, the form, and the manner of service thereof, must be observed in canceling the contract. There must be exact compliance with the terms of the provision for notice") *with Owens v. Second Baptist Church of La Grange,* 163 Ill.App.3d 442, 114 Ill.Dec. 557, 560, 516 N.E.2d 712, 715 (1987) ("the object of notice is to inform the party notified, and if the information is obtained in any way other than by formal notice, the object of notice is attained") (citations and quotations omitted); and *Schumacher v. Wolf,* 125 Ill.App. 81, 84 (1905) (explaining that if the "object of notice is attained," then exact compliance is not required). Several cases suggest that exact compliance is not needed if the spirit and purpose of the notice provision is satisfied (i.e., the party needing notice received notice). The Illinois Supreme Court is the ultimate arbiter of this apparent conflict in state law, not the federal court.

OR by mailing it, addressed to the defendants, to either the Carthage or Canton restaurant. Here, paragraph 17 of the complaint stated in writing that "the Canton Franchise and Carthage Franchise are terminated," and the complaint was personally served on the defendants on March 15, 1993. Accordingly, the McDonald's complaint satisfies both requirements.

The defendants' proposed interpretations of the notice provision are onerous in light of the literal wording of the Agreement's notice provision. First, the Agreement did not expressly require the signature of a McDonald's officer or licensing director on a notice to cancel the entire Agreement. The defendants maintain that the "Modification" provision applied to the entire contract; therefore, the notice needed the signature of an officer or licensing director. The defendants apparently realized the flaw in their briefed argument. During oral argument, the defendants softened their position and instead claimed that the "Modification" provision applied because the termination would effect the viability of the specific provision regarding conveyance of the license to use the McDonald's trademark or trade name. The defendants' new argument is just as uncompelling as their original one.

We agree with McDonald's that the "Modification" provision addresses changes made to a particular provision of the Agreement rather than elimination of the entire contract. Cancellation of the contract effects all of the Agreement's provisions. The defendants cannot carve out the licensing provision from among all the Agreement's provisions and identify this provision as the one impacted by McDonald's termination. When all provisions are impacted, a party cannot single out one provision for the sole purpose of evoking the "Modification" requirement of obtaining signatures from either a McDonald's officer or its licensing director. The "Modification" procedure is the "exception," not the "rule." It is absurd to refer to an exceptional provision expressly designed to detail notice for limited purposes (i.e., interpreting, modifying, or terminating a particular contractual provision) when none of the specified purposes have occurred under the given facts. A *particular* provision would not be terminated with McDonald's notice because *all* provisions are terminated by the contract termination. Accordingly, the exception in the "Modification" provision does not apply to the case

at bar. By default, we must resort to the general rule regarding notice.[5] Thus, there is no reason to look beyond the general notice provision when determining the requirements for providing notice of termination of the entire McDonald's Agreement.

Second, the Agreement did not require a particular form to terminate the contract. The defendants argue that the complaint is ambiguous regarding termination because of the language employed. Further, they contend that the complaint couches the termination in terms of an historic fact rather than a termination that is occurring simultaneously with receipt of the complaint. Paragraphs 27 and 32 of the complaint indicate that "on termination ... [the defendants] *lost* all rights to use the McDonald's trade names or marks" and that the defendants continued to operate the restaurants "even though the franchise agreements *had been* lawfully *terminated* " (emphasis added). The defendants assert that instead the notice should have used phrases such as the following: "the franchise agreements *are hereby terminated* " or "*shall be terminated upon service* of this complaint." It is no secret that McDonald's believed its previous correspondence satisfied the notice requirement. The complaint's use of past tense verbs is consistent with McDonald's belief that notice of termination already had been given to the defendants. Because the Agreement did not require any magic language to effect termination, wording that conveyed to the recipient that the franchise *either was or is terminated* accomplishes the purpose of notice. Watson testified in his deposition that he understood that the complaint reflected McDonald's position that the franchises were terminated. The complaint therefore conveyed to the defendants the intended message of termination. Thus, the use of past verb tense is not fatal to McDonald's notice of termination sent via the complaint. The defendants' arguments are completely without merit.

Finally, the defendants argue, under § 2-607 of the Uniform Commercial Code, that the franchise agreement contains an implied covenant of good faith and fair dealing, similar to the implied covenant that the Illinois courts have found in breach of warranty cases. They contend that this

---

[5]The defendants' argument becomes untenable when applied to other situations that could have arisen. If the defendants have decided to terminate the Agreement, their interpretation of the contract would require them to obtain the signature of either a McDonald's officer or licensing director before they could send notice of termination. Surely, the Agreement does not contemplate such a curious and cumbersome procedure.

implied covenant precludes McDonald's from using its complaint as notice of termination. In effect, the defendants are saying that McDonald's had to send them notice in the form of a letter or a similar document prior to filing suit.

By contrast, McDonald's argues that the defendants failed to raise this issue below. Additionally, McDonald's asserts that unlike the cases cited by the defendants, McDonald's made repeated written attempts to notify the defendants that they were jeopardizing their franchises with their overdue financial obligations. Further, McDonald's contends that the Illinois Uniform Commercial Code does not apply to the parties' relationship.

We will address the issue of the implied covenant of good faith and fair dealing because the defendants made this argument to the district court in their motion for reconsideration. At the outset, we note that the parties' franchisor/franchisee relationship is not governed by the Illinois Uniform Commercial Code, which governs the rights and responsibilities of buyers and sellers. We conclude that a party cannot be guilty of bad faith and unfair dealings when acting in compliance with the terms of a contractual agreement. *See, e.g., Hubbard Chevrolet Co. v. General Motors Corp.,* 873 F.2d 873, 878 (5th Cir.1989); and *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 138 (5th Cir.1979). In *Corenswet,* this court held that in the absence of positive state law, the UCC's provisions regarding good faith obligations cannot override or strike express contract terms. *Corenswet,* 594 F.2d at 138. The issue in *Corenswet* involved the defendant's right to terminate, without cause, a distributorship relationship pursuant to its contract which authorized "at will termination." Because Iowa law did not address the applicability of the UCC's good faith obligation on distributorships and franchises, this court refused to extend the obligation to the realm of distributorships. Similarly, we refuse to speak where Illinois has been silent. The UCC's good faith and fair dealing obligation cannot override the express terms of the McDonald's Agreement, which requires only that notice be in writing and then be served. Thus, because no Illinois law or contractual provision imposes the UCC's good faith obligation on the franchise relationship, we refuse to extend the UCC policy beyond the buyer/seller context.

Even if we were inclined to impute the UCC's good faith obligation on the franchise

relationship, we cannot say that McDonald's has breached its obligation by using the complaint as notice under the present facts.  The defendants rely on an Illinois Supreme Court case, *Board of Educ., City of Chicago v. A.C. & S., Inc.,* 131 Ill.2d 428, 137 Ill.Dec. 635, 546 N.E.2d 580 (1989), to support their position that using a complaint to provide notice of termination is never a fair business practice.  However, the concerns articulated by the Illinois Supreme Court when applying the implied covenant are inapplicable to the present facts.  In *A.C. & S.,* the court held that, in a Uniform Commercial Code case, a complaint cannot serve as notice of a breach of implied warranty when the plaintiff is a body politic rather than a consumer with personal injuries.  When making this pronouncement, the court acknowledged the existence of an Illinois appellate case supporting the "complaint as notice" proposition;  however, the court in *A.C. & S.* did not criticize the Illinois appellate case.[6]  Further, the *A.C. & S.* court noted that "[s]ome form of notice that the transaction is troublesome is a prerequisite to recovery." *A.C. & S.,* 137 Ill.Dec. at 651, 546 N.E.2d at 596.  The *A.C. & S.* court did not issue a blanket prohibition against using a complaint to provide notice, especially when the plaintiff has given several communications indicating that the parties' transaction was "troublesome."

If we assume for the sake of argument that the same policy considerations operating in a buyer/seller relationship also operate in a franchisor/franchisee relationship, we must determine whether the present defendants had prior notice of trouble in the franchise relationship, such that the complaint served as fair notice of termination.  Given the many warnings from McDonald's which threatened termination if the defendants did not cure their financial defaults, the defendants cannot claim that they were oblivious to McDonald's impending termination.  Each demand letter expressly threatened automatic termination.  McDonald's patient and repeated demands for the defendants to fulfill their obligations did not amount to bad faith or unfair dealings.  Thus, because McDonald's did not breach any implied covenant of good faith or fair dealing under the particular facts of this case, McDonald's was free to send notice of termination via personal service of its complaint.

---

[6]In *Goldstein v. G.D. Searle & Co.,* 62 Ill.App.3d 344, 19 Ill.Dec. 208, 213, 378 N.E.2d 1083, 1088 (1978), the court held that under the UCC there is a less stringent notice policy for consumers, and suggested that a complaint could serve as notice.

We hold that based upon the history of written communications detailing the problems with the defendants' franchises and based upon the language of the McDonald's franchise agreement (which operates as the law between these parties), the complaint which was personally served on the defendants satisfied the notice of termination requirements. Therefore, service of the complaint effectively terminated the McDonald's franchise agreement on March 15, 1993.

## B. *EFFECTIVE DATE OF TERMINATION*

The defendants assert that the Mississippi Franchise Act entitles them to 90 days advance notice of termination. A 90 day delay would not terminate the Agreement until June 13, 1993. Unfortunately, McDonald's correctly points out that the defendants' did not present these arguments to the district court. The Agreement expressly provided that Illinois law would be used to construe the contract. When the district court ruled that Illinois law governed the case, the defendants simply acquiesced in the holding. Therefore, because this issue was not properly preserved for appeal, and because no miscarriage of justice will occur with our refusal to consider it, we will not address this issue. *See, e.g., Yohey v. Collins,* 985 F.2d 222, 225 (5th Cir.1993); and *In re Goff,* 812 F.2d 931, 933 (5th Cir.1987).

## C. *INJUNCTIVE RELIEF*

The defendants claim that the district court improperly enjoined the defendants from interfering with the operation of the Carthage and Canton McDonald's restaurants. They assert that the lack of evidence that they were interfering with or that they were threatening to interfere with the restaurants precludes the issuance of an injunction. McDonald's argues that the defendants failed to make this argument to the district court and consequently did not preserve it for appeal. We agree. Therefore, we will not address this issue. *See, e.g., Yohey,* 985 F.2d at 225; and *In re Goff,* 812 F.2d at 933.

## II. *THE SECOND APPEAL*

In the second appeal, the defendants contest the district court's grant of declaratory relief that the defendants no longer had an interest in the restaurants because a genuine issue existed regarding the adequacy of the contract termination. The defendants also appeal the court's award of damages

because McDonald's did not present evidence that the defendants intended to violate the trademark or present evidence of consumer confusion. Finally, the defendants challenge the award of lost profits and attorneys' fees as well as the denial of their motion to dismiss or stay the federal action pending a disposition in the state litigation.

Because we hold, with respect to the first appeal, that the complaint served as adequate notice of termination, the issue of whether the district court erred in declaring the defendants' interests in the restaurants ceased with the contract termination is now moot. Our decision regarding the contract termination also obviates the need to decide whether the court erred in granting partial summary judgment on the defendants' liability for trademark infringement damages. Further, our decision moots the issue of whether the district court erred in refusing to either stay or dismiss the federal action pending the outcome of the related litigation in state court. Accordingly, we will not address any of these arguments.

A. *PROFITS*

The defendants argue that the district court should not have allowed McDonald's to recover lost profits in the absence of evidence that the defendants were intentionally deceptive. McDonald's argues that the defendants failed to make this argument to the district court and consequently did not preserve it for appeal. We agree that this issue is being raised for the first time on appeal. Because refusal to review this issue will not result in grave injustice, we decline to address this issue. *See, e.g., Yohey,* 985 F.2d at 225; and *In re Goff,* 812 F.2d at 933.

B. *ATTORNEYS' FEES*

The defendants argue that the district court should have granted their peremptory instruction denying McDonald's request for attorneys' fees, in spite of a valid contractual provision allowing McDonald's to recover its fees. The defendants assert that the claim for attorneys' fees should not be upheld. They contend that the case was completely unnecessary because McDonald's held their $30,000.00 security deposit. McDonald's counters that its suit was not frivolous. Suit was necessary to remove the defendants from the restaurants. Further, McDonald's maintains that it received $15,946.00 above the $30,000.00 security deposit as well as declaratory and injunctive relief.

We review an award of attorneys' fees authorized by statute for an abuse of discretion. *Atchison, Topeka & Santa Fe Ry. Co. v. Sherwin-Williams Co.,* 963 F.2d 746, 751 (5th Cir.1992); and *Thomas v. Capital Sec. Services, Inc.,* 836 F.2d 866, 884 n. 25 (5th Cir.1988) (en banc). Similarly, we review an award or denial of attorneys' fees provided by contract for abuse of discretion. *Cable Marine, Inc. v. M/V Trust Me II,* 632 F.2d 1344, 1345 (5th Cir.1980). However, the district court's discretion to deny the award is much more limited when the contract provides for attorneys' fees. *Id.* ("Where attorney's fees are provided by contract, a trial court does not possess the same degree of equitable discretion to deny such fees that it has when applying a statute allowing for a discretionary award."); *see also Perry v. Stewart Title Co.,* 761 F.2d 237, 238 (5th Cir.1985) (remanding on the issue of the district court's denial of attorneys' fees and instructing the district court to weigh whether the award would be inequitable or unreasonable in this case). The district court abuses its discretion if it awards contractually-authorized attorneys' fees under circumstances that make the award inequitable or unreasonable or fails to award such fees in a situation where inequity will not result.

We have held that the district court in its discretion may decline to award reasonable attorneys' fees when the plaintiff pursues a claim unnecessarily. *Cable Marine,* 632 F.2d at 1345. In *Cable Marine,* the defendant made several generous settlement offers several months before trial. The defendants' settlement figure was slightly below the amount requested by the plaintiff. This court affirmed the district court's conclusion that the plaintiff incurred needless expense in continuing the suit beyond the settlement offers. *Id.* at 1346. Inequity would have resulted if the district court in *Cable Marine* had awarded the contractually-authorized fees.

Accordingly, the issue before us is whether the award of attorneys' fees was inequitable or unreasonable under the circumstances of the case at bar. Here, McDonald's did not receive any reasonable settlement offers. Further, when McDonald's attempted to compromise a consent judgment, the defendants allegedly demanded that McDonald's pay them $1,700,000.00. In light of the defendants' unwillingness to settle the case and in view of the recovery McDonald's received beyond its $30,000.00 security deposit, McDonald's initiation and continuation of its suit was

necessary. Further, the award of the attorneys' fees is not inequitable or unreasonable because the defendants provoked the need to file suit, and the defendants' obstinate stance regarding the proposed consent judgment ultimately increased the cost of litigation. We find, therefore, that the district court did not abuse its discretion in denying the defendants' peremptory instruction and in awarding McDonald's attorneys' fees pursuant to the Agreement.

## *CONCLUSION*

For the foregoing reasons, we AFFIRM the judgment of the district court.