**GENERAL AVIATION, INC., Plaintiff,**

v.

**CESSNA AIRCRAFT COMPANY, Defendant.**

**No. G85–890–CA5.**

United States District Court, W.D. Michigan, S.D.

Dec. 16, 1988.

Michael E. Cavanaugh, Fraser, Trebilcock, Davis & Foster, Lansing, Mich., for plaintiff.

Roger Clark, Warner, Norcross & Judd, Grand Rapids, Mich., for defendant.

## OPINION OF THE COURT

ROBERT HOLMES BELL, District Judge.

This case presents numerous claims growing out of the nonrenewal of a distributorship agreement between the parties. Defendant has moved for summary judgment under Fed.R.Civ.P. 56(c) as to all claims.

Plaintiff General Aviation, Inc., describes itself as "a fixed base operator located at Capitol City Airport in Lansing, Michigan, providing a variety of aviation services, including flight training, aircraft charters, aircraft maintenance and gasoline sales." Defendant Cessna Aircraft Company is an aircraft manufacturer with its principal place of business in Wichita, Kansas. From 1977 to 1984, the parties entered into a series of one-year dealer agreements under which General Aviation agreed to sell and service Cessna aircraft. At the conclusion of the 1984 Agreement, Cessna refused to renew the agreement and discontinued the distributorship relationship. The stated reason for Cessna's decision is General Aviation's failure to sell its "quota" of aircraft in 1984. General Aviation asserts this reason is pretextual and points to many other dealers whose distributorship agreements were renewed in spite of sales performance records no better than General Aviation's. The real reason for Cessna's decision is said to be the tension caused by General Aviation's expressed dissatisfaction with the quality of the Cessna aircraft it was selling and servicing. General Aviation contends Cessna's action is wrongful and asserts several theories of relief.

Cessna's motion for summary judgment requires the Court to look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the moving party carries its burden of "showing" that there is an absence of evidence to support an adverse claim or defense, then the nonmoving party may not simply rely on its pleadings, but must demonstrate, by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of fact concerns "material" facts only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. *Id.* The Supreme Court has elaborated on this materiality requirement as follows:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett, supra*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The Court now employs the foregoing standards in evaluating each of General Aviation's claims.

## I. BREACH OF EXPRESS CONTRACT

### A. *Promise of Continuing Relationship—Written Agreement*

General Aviation contends Cessna had committed itself to a continuing relationship and was not justified in terminating it absent good cause. This claim is presented in count I of the first amended complaint. It is asserted in the face of unequivocal language in the parties' final written Agreement indicating, "This Agreement shall terminate upon expiration of its term." Cessna Conquest Sales and Service Agreement of 1984 ("1984 Agreement"),

¶ D.1. The term of the Agreement is defined with equal clarity:

This Agreement becomes effective on the date of its execution [October 27, 1983] and shall continue in force until midnight September 30, 1984, unless sooner terminated as herein provided.

1984 Agreement, ¶ E.7. And while the parties may genuinely have "contemplated" renewal of the Agreement at the conclusion of its term, they agreed that absent execution of a new Agreement, their *relationship* would "automatically end." *Id.*[1] Thus, at the end of the Agreement's term, affirmative action was required of the parties, not only to renew the Agreement, but also to continue the relationship. The unavoidable implication of this language is twofold: (1) that absent an Agreement there would be no relationship; and (2) that inaction by either party would result in termination of the relationship, without regard for the party's reasons therefor.

■ General Aviation's contrary position is based primarily on the following language:

Cessna and Dealer recognize that, subject to the conditions set forth in Paragraph E.7., it is contemplated the relationship between Dealer and Cessna shall be a continuing one.

1984 Agreement, ¶ B.2.(b). This language is contained in the "Operational Requirements" of the Agreement and pertains particularly to ordering by General Aviation of new aircraft, accessories and equipment. It forms a preface for the following provision:

Accordingly, it is agreed that aircraft orders may be placed for delivery of aircraft outside the term of this Agreement. In such event, the provisions of such orders on prices, deposits and liquidated damages shall be those in effect at the time of delivery of aircraft so ordered.

*Id.* Reading the language asserted by General Aviation in context reveals that its purpose is limited.

■ Moreover, a statement of the parties' "contemplation" that the relationship will be ongoing, cannot reasonably be construed as a "promise" by either party that the relationship will not be terminated, even upon expiration of the pending Agreement's term, absent "good cause." This is true notwithstanding the use of the word "shall." While "shall" usually connotes mandatoriness, the context of its use may compel a different construction. Here, the parties' use of the phrase "it is contemplated" in conjunction with "shall" vitiates its mandatory quality and clearly indicates intention to connote simple futurity.

The correctness of this construction is borne out by the very language of the provision itself. The parties' contemplation of a continuing relationship is expressly "subject to the conditions set forth in Paragraph E.7.," dealing with automatic termination of the *relationship* at the end of the Agreement's term absent a new Agreement. Thus, ¶ B.2.(b) does not purport to alter or conflict with the termination provisions of ¶ E.7., but is subordinate thereto. To rely on ¶ B.2.(b) as a basis for understanding that the Agreement was subject to nonrenewal, or the relationship subject to termination, only for cause, is to ignore the provision's plain language. General Aviation's proffered construction of ¶ B.2.(b) is plainly untenable.

Reading the Agreement as a whole compels the same conclusion. If ¶ B.2.(b) means what it, on its face, purports to mean, then it leaves unaltered the "nonrenewable-at-will" status of the Agreement and is consistent with other termination provisions. Thus, by reading the provision in a direct, straightforward manner, the Court observes its duty to construe the

---

**1.** ¶ E.7. provides in pertinent part:

"Unless Cessna has notified Dealer of its intention not to renew this Agreement, Cessna will offer Dealer prior to September 1, 1984, a Cessna Conquest Sales and Service Agreement for the succeeding Agreement year, provided this Agreement has not been terminated or notice of termination has not been mailed prior to such date. Unless Dealer executes and returns such new Agreement within thirty (30) days following the date such Agreement is mailed or presented to Dealer, it shall be deemed that such offer has been rejected and Dealer's relationship with Cessna as a Dealer shall automatically end."

contract so as to harmonize and give effect to all its parts, if possible. *Brown v. Lang,* 234 Kan. 610, 675 P.2d 842, 847 (1984).[2]

Accordingly, the Court finds within the four corners of the parties' written Agreement no promise of a continuing relationship whereby Cessna agreed not to fail to renew the Agreement absent good cause.

B. *Promise of Continuing Relationship—Parol Evidence*

■ Further, the Court must decline to consider parol evidence offered for the purpose of showing that the parties' actual agreement is different from the written Agreement. General Aviation asks the Court to enforce oral representations made by representatives of Cessna as though they were part of the written Agreement. Essentially, these representations appear to be assurances to dealers *en masse* that their relationships with Cessna would be continuing and that they would be treated fairly and equally. Consideration of such evidence for the purpose of varying the terms of the parties' written Agreement is barred by the parol evidence rule.[3] This is true whether the parol evidence rule applied originates in the common law or in Article 2 of the Uniform Commercial Code, governing contracts for sales of goods.

Michigan's common law parol evidence rule is stated succinctly as follows:

Where a contract is clear and unambiguous, parol evidence of negotiations cannot be admitted to vary the contract ... The parol evidence rule also bars admission of prior or contemporaneous agreements that contradict or vary the written contract ... Prerequisite to application of the parol evidence rule is a finding that the parties intended the writing to be a complete expression of their agreement.

*Central Transport, Inc. v. Fruehauf Corp.,* 139 Mich.App. 536, 544, 362 N.W.2d 823 (1984) (citations omitted). The facts of the instant case satisfy all of these elements. The Agreement, by its own terms, expressly purports to represent the parties' exclusive and complete agreement.[4] By its length and thoroughness, too, it attests to the parties' intent to describe all aspects of their relationship in the written Agreement. The Agreement's provisions, regarding termination and renewal, as indicated *supra,* are not ambiguous. Only if the language of ¶ B.2.(b) is given the unnatural and contrived construction urged by General Aviation does any ambiguity appear. And finally, the proffered evidence of prior and contemporaneous agreements would tend to vary and even contradict the clear language of the Agreement. Under these circumstances, the common law parol evidence rule clearly operates to bar consideration of the proffered evidence in connection with General Aviation's breach of express contract claim.

Application of the Uniform Commercial Code (UCC) parol evidence rule yields the same conclusion.[5] It is adopted in Michigan at M.C.L. § 440.2202, M.S.A. § 19.2202 and provides:

Terms with respect to which the confirmatory memoranda of the parties agree

---

**2.** The Agreement expressly provides it "shall be construed and interpreted in accordance with the laws of the State of Kansas." 1984 Agreement, ¶ E.5.

**3.** Although the Agreement is to be interpreted in accordance with Kansas law, the parol evidence rule is not a rule of contract interpretation, but a rule of substantive law. 30 Am.Jur.2d, Evidence, § 1017; Anderson, 2 Uniform Commercial Code, 3d ed., § 2–202:5. This Court is therefore bound to apply the law of the forum state, Michigan law, relative to the parol evidence rule.

**4.** Paragraph E.8. of the 1984 Agreement provides: "Except as specifically stated herein, all understandings and agreements between the parties relative to Cessna Conquest aircraft products are contained in this Agreement.

Upon its effective date, this Agreement cancels all prior Agreements between the parties relative to the sale of such Cessna aircraft products. No subsequent change in or addition to this Agreement shall be valid or binding on either party until reduced to writing and signed in accordance with paragraph 9 below."

**5.** The position that the instant distributorship agreement constitutes a contract for the sale of goods governed by article 2 of the UCC has not been contested. For present purposes, therefore, it is assumed, consistent with the majority view, see *Sally Beauty Co. v. Nexxus Products Co., Inc.,* 801 F.2d 1001, 1005–1006 (7th Cir.1986), that article 2 of the UCC governs and its parol evidence rule applies.

or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

   (a) by course of dealing or usage of trade (section 1205) or by course of performance (section 2208); and

   (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

This rule does not sweep as broadly as the common law rule.[6] It nonetheless precludes consideration of the proffered evidence, because again, the Agreement clearly appears to have been intended as an exclusive and complete statement; and because the proffered evidence would not merely explain and supplement, but would tend to contradict the written agreement.

The Court thus concludes the asserted promise of a continuing relationship was not a part of the parties' express agreement and is not enforceable through General Aviation's breach of express contract claim.

### C. *Promise to Evaluate on Basis of Reasonable Criteria*

General Aviation also alleges Cessna's refusal to renew the Agreement violated its express promise to measure General Aviation's performance by reasonable criteria. The contractual provision which forms the basis for this claim is found at ¶ A.3. of the 1984 Agreement.[7] Inasmuch as Cessna's stated reason for not renewing the Agreement was General Aviation's failure to satisfy the minimum sales performance standards of subparagraph (b) thereof, General Aviation calls into question the legitimacy and reasonableness of Cessna's determination. A threshold question, however, is whether the "reasonable criteria" provision has any bearing on the freedom of either party to choose not to renew the Agreement.

Paragraph A.3. does not speak directly to the question of nonrenewal. In fact, it refers to termination only once—with respect specifically to the criteria set forth in subparagraph (b). Otherwise, ¶ A.3. offers no clue as to the consequences of failure to satisfy the reasonable criteria.

The intended import of the reasonable criteria becomes apparent, however, upon reference to part D of the Agreement. Part D outlines various means whereby the Agreement may be terminated. In ¶ D.3., eight grounds for immediate termination (i.e., termination before expiration of the Agreement's term without prior written notice), including failure to attain minimum sales performance standards, are enumerated. While failure to consummate the

**6.** The official UCC comments of the National Conference of Commissioners and American Law institute highlight two clear differences which are arguably relevant: (a) a finding that the written contract is ambiguous is not a condition precedent to consideration of extrinsic evidence related to course of dealing, usage of trade or course of performance; and (b) parol evidence of consistent additional terms which explain or supplement, without contradicting, the written contract may be considered, unless the contract is found to have been intended as the complete and exclusive statement of the parties' agreement.

**7.** 3. In determining whether Dealer has satisfied the sales and service responsibilities as herein set forth, Dealer's performance shall be measured by such reasonable criteria as Cessna may develop from time to time. This may include, but shall not be limited to, the following:

(a) Dealer's sales performance in the Area relative to the sales performance of other Cessna Conquest dealers in their respective areas of responsibility.

(b) Dealer's consummation of three (3) bona fide retail sales of Cessna Conquest aircraft (at least one (1) of which must be a Model 441) to retail customers within Dealer's Area during the Fiscal Year ending September 30, 1984. Sales made outside of the Area or to other Cessna Conquest dealers shall not be considered in determining whether Dealer has satisfied the above criteria. Dealer agrees that these criteria are reasonable and that failure to satisfy them shall be a basis for termination at Cessna's option under the provisions of Paragraph D.3.(g).

(c) Dealer's overall service performance and the degree of customer satisfaction attained as compared to other Cessna Conquest dealers.

minimum required sales is the stated reason for nonrenewal by Cessna in this case, it is clear that Cessna has not here exercised its power of immediate termination under ¶ D.3.

Paragraph D.4. provides that "Cessna may terminate this Agreement upon not less than thirty (30) days written notice in the event Dealer fails to comply with any term or provision of this Agreement...." Thus, it appears the reasonable criteria of ¶ A.3. form a second potential basis for termination of the Agreement before the expiration of its term, upon giving 30 days prior written notice. Although Cessna did give General Aviation 30 days prior written notice of its intent not to renew the Agreement, it is clear that Cessna has not here exercised its power of termination under ¶ D.4.

■ Paragraph D.1. provides the "Agreement shall terminate upon expiration of its term." This manner of termination occurs simply through passage of time, occurs without regard for whether the reasonable criteria of ¶ A.3. have been satisfied, and occurs automatically in the absence of efforts by both parties to execute a new agreement for the succeeding year. This is the manner of termination effected in this case. Thus, whether Cessna evaluated General Aviation's performance correctly on the basis of the reasonable criteria in ¶ A.3. is immaterial. That Cessna offered a reason for its decision not to renew was, under the rights and responsibilities created by the parties' written Agreement, merely gratuitous. The alleged failure of Cessna to correctly apply the reasonable criteria in reaching its decision not to renew was, as a matter of law, not a breach of the parties' Agreement.[8]

Accordingly, the Court concludes this aspect, too, of General Aviation's breach of express contract claim must fall. The 1984 Agreement having been construed in accordance with the plain meaning of its clear and unambiguous language, and there being no genuine issue as to any material fact, count I of the first amended complaint must be dismissed.

## II. BREACH OF IMPLIED CONTRACT

In counts II and III of the first amended complaint, General Aviation alleges essentially that Cessna's refusal to renew the Agreement was wrongful because arbitrary. Several theories are asserted in support of the proposition that the Court ought to imply-at-law a duty on Cessna's part not to terminate the parties' continuing relationship absent good cause. The Court evaluates these theories fully cognizant that before the Court are two experienced corporate entities who chose to enter into an extensive and, in pertinent respects, unambiguous written Agreement governing their relationship.

### A. *Implied Duty of Good Faith*

General Aviation contends that implicit within the 1984 Agreement is a covenant of good faith. This duty of good faith is said to proceed from the UCC. Under UCC § 1-203, codified in Kansas at K.S.A. § 84-1-203, "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." A number of courts have held this duty limits the freedom of a party in Cessna's position to terminate a franchise or distributorship agreement. See e.g. *Cambee's Furniture Inc. v. Doughboy Recreational, Inc.*, 825 F.2d 167, 174–175 (8th Cir.1987); *Larese v. Creamland Dairies, Inc.*, 767 F.2d 716, 717 (10th Cir.1985); *Arnott v. American Oil Co.*, 609 F.2d 873, 881–883 (8th Cir.1979); *Baker v. Ratzlaff*, 1 Kan. App.2d 285, 564 P.2d 153 (1976).

■ It is clear, however, that this obligation of good faith cannot be employed, in interpreting a contract, to override express contract terms. *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 679 (2d Cir.1985); *Cardinal Stone Co., Inc. v. Rival Mfg. Co.*, 669 F.2d 395, 396 (6th Cir.1982); *Corenswet, Inc. v. Amana Re-*

---

**8.** To the extent General Aviation has asked the Court to consider parol evidence concerning the parties' interpretation of ¶ A.3., the request is

denied for the same reasons stated *supra* in part I B of this Opinion.

*frigeration, Inc.*, 594 F.2d 129, 138 (5th Cir.1979), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). "In the name of good faith, a party cannot be required to forego or surrender a right that he otherwise possesses." Anderson, 1 Uniform Commercial Code, 3d ed., § 1–203:11. Rather, the chief purpose of the good faith obligation is to enable enforcement of contract terms in a manner consistent with the parties' reasonable expectations. *Corenswet, supra*, 594 F.2d at 138.

The Court has already expressed its opinion regarding the completeness and clarity of the parties' written Agreement. In view of the explicit provisions of part D of the Agreement, concerning termination, can General Aviation reasonably have expected that Cessna was obligated to renew the Agreement each year unless there were "cause" not to do so? The Agreement, which, again, expressly purports to be complete and exclusive, provides:

(1) that General Aviation may terminate the Agreement at any time upon 30 days prior written notice (¶ D.2.);

(2) that Cessna may terminate immediately in the event of any of 8 enumerated actions by General Aviation (¶ D.3.);

(3) that Cessna may terminate upon 30 days prior written notice in the event of any other contract violation by General Aviation (¶ D.4.);

(4) that Cessna may terminate upon 30 days prior written notice upon the occurrence of any of "certain other" recognized, but unspecified conditions (¶ D.6.);

(5) that the Agreement shall terminate upon expiration of its term unless both parties earlier execute a new Agreement for the succeeding year. (¶ D.1.); and

(6) that Cessna's right to modify terms of the Agreement in the new Agreement for the succeeding year is unlimited (i.e., unlimited by the terms of the only paragraph which addresses the subject of renewal) (¶ E.7.).

■ Thus, while the Agreement does not contain the precise language, "either party may, for any reason, decline to renew the Agreement at the conclusion of its term," any other construction of the Agreement would be inconsistent with the necessary implications of the foregoing terms. Is it reasonable to expect that Cessna would be bound to renew the Agreement absent good cause for nonrenewal (a) even though General Aviation had the right to terminate at any time; and (b) even though Cessna had the right to terminate upon 30 days notice upon the occurrence of any of certain recognized but undefined conditions; and (c) even though the Agreement would terminate upon the expiration of its term and Cessna had unlimited power to modify the terms of the new Agreement? The Court believes all these questions must be answered in the negative. Therefore, recognizing that the implied duty of good faith is designed not to override express contract provisions, but to serve the parties' *reasonable* expectations, the Court concludes Cessna had no duty to renew the Agreement absent good cause for nonrenewal.

■ The Court acknowledges General Aviation may reasonably have expected that absent good cause, Cessna would continue to renew the Agreement each year. General Aviation was required to make a substantial investment in promoting Cessna aircraft and in acquiring an adequate inventory of tools and parts to service Cessna aircraft. It was justified in expecting this investment would be rewarded by continuation of the relationship as long as it was mutually beneficial. But this is far different from the "reasonable expectation" which the Court is here urged to enforce, i.e., that Cessna's "arbitrary" decision not to renew would be actionable as a breach of contract. For where, as here, a commercial relationship is governed by a thorough and explicit contract, the parties' expectations are judicially enforceable only insofar as they are manifest, expressly or by implication, in the contract. The implied covenant of good faith cannot be used by the Court as a tool for rewriting the parties' Agreement based on unspecified notions of fairness. Here, as indicated, the express termination provisions of the Agreement negate the existence of the asserted implied good faith duty to renew.

### B. *Fiduciary Relationship*

■ General Aviation contends the nature of the parties' relationship is such as to impose fiduciary responsibilities upon Cessna. This position is not without authority. In *Arnott v. American Oil Co.*, 609 F.2d 873, 881 (8th Cir.1979), the court held, applying South Dakota law, that a fiduciary duty is inherent in a franchise relationship.[9]

> A franchise, unlike a tenant pursuing his own interests, builds the goodwill of his own business and the goodwill of the franchiser.... This facet of the relationship has led to the recognition that the franchise relationship imposes a duty upon franchisers not to act arbitrarily in terminating the franchise.

*Id.*, at 882 (citation omitted). However, a careful reading of *Arnott* and subsequent Eighth Circuit case law indicates the *Arnott* holding rests not upon a "fiduciary duty" in the traditional sense of the term, but upon the implied covenant of good faith. See *Cambee's Furniture Inc. v. Doughboy Recreational, Inc.*, 825 F.2d 167, 171 (8th Cir.1987); *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 355 (7th Cir.1982).

Moreover, whether the asserted duty not to terminate the relationship arbitrarily is said to proceed from a fiduciary relationship or from the implied covenant of good faith, the scope of the duty is necessarily limited by the terms of the governing contract. *Phillips v. Chevron U.S.A., Inc.*, 792 F.2d 521, 524 (5th Cir.1986).

> If the parties, in seeking their individualized interests, comply with the terms of a contract in which they are also the parties, it would be difficult to find a breach of a fiduciary duty. Although fiduciaries have mutual interests, they also have individual goals. If part of their relationship is set out in a contract, the parties have affirmatively recognized, in part, those individual interests. Unless the contracted terms are unconscionable, illegal, or violative of public policy, fiduciaries, as a practical matter, acknowledge that activity in conformance with the terms of the contract cannot amount to misconduct that constitutes a breach of a fiduciary duty.

*Carter Equipment Co. v. John Deere Industrial Equipment Co.*, 681 F.2d 386, 392, n. 14 (5th Cir.1982).

The Court has already determined, as a matter of law, that Cessna's decision not to renew the Agreement did not violate the express terms of the contract or the implied covenant of good faith. For the same reasons the Court concludes there has been no breach of a fiduciary duty.

### C. *Unconscionability*

If the Agreement is construed as permitting Cessna to terminate the relationship without cause, General Aviation contends enforcement of such provisions should be barred as unconscionable. Under UCC § 2–302, K.S.A. § 84–2–302, the Court may limit the application of any contract clause found to be unconscionable as a matter of law so as to avoid any unconscionable result. The concept of unconscionability, although elusive of definition, is designed generally to prevent unjust enforcement of onerous contract terms which one party is able to impose on another because of a significant disparity in bargaining power. Anderson, 2 Uniform Commercial Code, 3d ed., § 2–302:4. The concept does apply to commercial contracts and is not limited to consumer transactions. However, a contract between corporations in a commercial setting is not likely to be found unconscionable unless the parties were of grossly unequal bargaining power at the time the contract was entered into. *Id.*, § 2–302:39.

■ There is some authority for the position that a contract term permitting termination of a franchise or dealership relationship without cause may be held unconscionable. *deTreville v. Outboard Marine*

---

**9.** The 1984 Agreement expressly provides the appointment of Cessna as "Dealer" does not constitute a "franchise." ¶ A.2. The Court is satisfied, however, that the parties' relationship bears sufficient indicia of a franchise to constitute a franchise in fact, irrespective of the label assigned to the relationship by the parties. For purposes of determining the existence of a fiduciary duty, therefore, the relationship is treated as a franchise relationship.

*Corp.*, 439 F.2d 1099 (4th Cir.1971); *Baker v. Ratzlaff*, 1 Kan.App.2d 285, 564 P.2d 153 (1977). Under the present facts, however, even when viewed in the light most favorable to General Aviation, such a holding is clearly not warranted.

First of all, termination-without-cause provisions are not unconscionable per se. *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 138–139 (5th Cir.1979); *Cardinal Stone Co., Inc. v. Rival Mfg. Co.*, 669 F.2d 395, 396 (6th Cir. 1982). Second, *both* parties had an unrestricted right under the Agreement to decline to renew the Agreement at the expiration of its term. The contract is not ambiguous in this respect, and although Cessna's action may not have been expected, General Aviation is not the victim of unfair surprise. Third, both parties are experienced commercial entities whose bargaining power upon entering into the Agreement was not so grossly unequal as to suggest that Cessna's express freedom not to renew was the product of overreaching. Fourth, that General Aviation did not meet its sales quota for 1984 is not contested. This deficiency constituted a basis for immediate termination under ¶ D.3.(g) of the Agreement and would seem to represent *prima facie*, a legitimate business justification for nonrenewal. Fifth, even if the stated reason for nonrenewal were found to be pretextual and Cessna's decision were found to have been motivated by a desire to avoid tensions caused by General Aviation's expressed dissatisfaction with the quality of Cessna aircraft, nonrenewal could still not be fairly characterized as malicious or as proceeding from bad faith so as to warrant a finding of unconscionability. For such a reason would seem to have naturally been within the parties' contemplation upon granting to each other the freedom not to renew. Consider, in this regard, the following discussion:

> Since a termination without cause will almost always be characterizable as a "bad faith" termination, focus on the terminating party's state of mind will always result in the invalidation of unrestricted termination clauses. We seriously doubt, however, that public policy frowns on any and all contract clauses permitting termination without cause. Such clauses can have the salutary effect of permitting parties to end a soured relationship without consequent litigation. Indeed when, as here, the power of unilateral termination without cause is granted to both parties, the clause gives the distributor an easy way to cut the knot should he be presented with an opportunity to secure a better distributorship from another manufacturer. What public policy does abhor is economic overreaching—the use of superior bargaining power to secure grossly unfair advantage.

*Corenswet, supra*, 594 F.2d at 138–139. Thus, even if General Aviation's view of the facts is accepted, the parties' "soured relationship" represents a "not unconscionable" basis for exercise of Cessna's right to not renew.

Accordingly, the Court concludes there is no genuine issue as to any material fact: Cessna's exercise of its contractual right is not unconscionable.

### D. *Public Policy*

Paragraph E.5. of the Agreement provides in pertinent part:

> If any provision of this Agreement contravenes any law, including the law of the place of performance, such provision shall be deemed not to be part of this Agreement ...

General Aviation argues those provisions here construed as permitting nonrenewal without cause contravene Michigan public policy and should be held unenforceable.

In support of the argument, two Michigan statutes are cited. Under Michigan's Franchise Investment Law, a contract provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances is void and unenforceable. M.C.L. § 445.1527(e), M.S.A. § 19.854(27)(e). Another statute, regulating motor vehicle dealers, distributors and manufacturers provides, in part, as follows:

Notwithstanding the terms, provisions, or conditions of a dealer agreement, the parties to the agreement, in performing, dealing, or complying with the terms, provisions, or conditions of a dealer agreement or in terminating, canceling, or failing to renew a dealer agreement, shall act with good cause and in accordance with reasonable standards of fair dealing.

M.C.L. § 445.522(1), M.S.A. § 19.856(2)(1). While conceding that neither of these statutes may directly govern the instant Agreement, General Aviation contends they nonetheless represent evidence of Michigan public policy.

On the other hand, the Michigan case law relied on most heavily by General Aviation, *J.R. Watkins Co. v. Rich,* 254 Mich. 82, 235 N.W. 845 (1931), actually undermines its argument:

> *A provision in a contract for termination at the option of a party is valid.* But where the relationship is commercial and does not involve fancy, taste, sensibility, judgment, or other personal features, the option may be exercised only in good faith.

254 Mich. at 84–85, 235 N.W. 845 (emphasis added). Thus, under *Watkins,* although a right not to renew a distributorship agreement must arguably be exercised in good faith, such right is not void as contrary to public policy. Consistent with this conclusion is the ruling in *Aaron E. Levine & Co., Inc. v. Calkraft Paper Co.,* 429 F.Supp. 1039, 1050 (E.D.Mich.1976), that Michigan law follows the general rule that a distributorship contract is terminable at will by either party upon giving reasonable notice.

■ The Court remains unpersuaded that Michigan public policy prohibits persons, notwithstanding their freedom of contract, from entering into an agreement whereby each is free to refrain from renewing it for any reason. The cited statutes appear not to be evidence of a changed public policy, but carefully drawn exceptions to established law. The Court declines the invitation to broaden their scope through judicial legislation.

### E. *Part II Conclusion*

The Court has thus evaluated and rejected each of the theories asserted in support of the claims embodied in counts II and III.[10] Accordingly, both counts are subject to summary judgment.

### III. VIOLATION OF DEALER AGREEMENT STATUTE

■ In count IV of the first amended complaint, General Aviation alleges Cessna's conduct is violative of Michigan's statute regulating motor vehicle dealers, distributors and manufacturers, M.C.L. § 445.521 *et seq.,* M.S.A. § 19.856(1) *et seq.* Cessna contends the statute is inapplicable because the 1984 Agreement and resulting relationship here at issue are unrelated to motor vehicles. The Court agrees.

The statute, at M.C.L. § 445.521(i), M.S.A. § 19.856(1)(i), defines "motor vehicle" in accordance with the definition provided in the Michigan Vehicle Code at M.C.L. § 257.33, M.S.A. § 9.1833, "other than a bus, tractor, and farm equipment:"

> "Motor vehicle" means every vehicle which is self-propelled and every vehicle which is propelled by electric power obtained from over-head trolley wires, but not operated upon rails."

Further, "vehicle" is defined under the Michigan Vehicle Code as follows:

> "Vehicle" means every device in, upon, or by which any person or property is or

**10.** General Aviation has also *argued* for relief on the basis of promissory estoppel even though the theory is not stated as a claim in the first amended complaint. The court is asked to enforce oral assurances that the parties' relationship would be continuing absent good cause for termination. Though these promises were not made a part of the written contract, they are said to be enforceable because they were calculated to induce and succeeded in inducing detrimental reliance by General Aviation.

However, where, as here, the performance which is said to satisfy the detrimental reliance requirement of the promissory estoppel theory is the same performance which represents consideration for the written contract, the doctrine of promissory estoppel is not applicable. See *Walker v. KFC Corp.,* 728 F.2d 1215, 1220 (9th Cir.1984). Hence, even if a promissory estoppel claim had been properly presented, it too would be subject to summary judgment.

may be transported or drawn upon a highway, excepting devices exclusively moved by human power or used exclusively upon stationary rails or tracks and excepting a mobile home as defined in section 2 of Act No. 419 of the Public Acts of 1976, being section 125.1102 of the Michigan Compiled Laws.

M.C.L. § 257.79, M.S.A. § 9.1879. Consistent with these definitions, Michigan courts have interpreted "vehicle" to mean a self-propelled device which can be lawfully operated upon a highway; or in, upon, or by which any person or property can be lawfully transported or drawn upon a highway. *Jones v. Cloverdale Equipment Co.*, 165 Mich.App. 511, 513–514, 419 N.W.2d 11 (1987); *Calladine v. Hyster Co.*, 155 Mich. App. 175, 179–180, 399 N.W.2d 404 (1986) lv. app. denied 426 Mich. 882 (1986); *Woods v. Progressive Mutual Ins. Co.*, 15 Mich. App. 335, 338, 166 N.W.2d 613 (1968). "Highway," too, is defined in the Michigan Vehicle Code:

> "Highway or street" means the entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel.

M.C.L. § 257.20, M.S.A. § 9.1820 and M.C. L. § 257.64, M.S.A. § 9.1864.

The aircraft which represent the subject of the parties' Agreement and relationship cannot be lawfully operated upon the publicly maintained ways open for public vehicular travel. Accordingly, aircraft are not motor vehicles within the contemplation of the motor vehicle dealer agreement statute. General Aviation's creative argument that aircraft are motor vehicles because the airways are "highways" is not supported by any case law specifically so holding and is unpersuasive.

The motor vehicle dealer agreement statute, upon which count IV rests, has no application in this case. Count IV must be dismissed.

## IV. VIOLATION OF FRANCHISE INVESTMENT LAW

█ Count V of the first amended complaint contains a claim alleging the 1984 Agreement is in violation of Michigan's Franchise Investment Law, M.C.L. § 445.1501 *et seq.*, M.S.A. § 19.854(1) *et seq.* This statute regulates the offer, sale and purchase of franchises and prohibits fraudulent practices in relation thereto. Even assuming the parties' relationship is a "franchise," (see footnote 9, *supra*), however, the statute has no application to the 1984 Agreement or the circumstances leading to its execution. The statute evinces a clear legislative intent to exempt from its coverage renewals of existing franchises and modifications of franchise agreements where there is no interruption in the operation of the franchise and no material change in the franchise relationship. See M.C.L. § 445.1506(1)(e), M.S.A. § 19.854(6)(1)(e) and M.C.L. § 445.1503(3), M.S.A. § 19.854(3)(3). The 1984 Agreement represents a renewal or continuation of a franchise relationship which had endured uninterrupted for at least six years prior thereto. Hence, the Agreement and the parties' relationship are not subject to the Franchise Investment Law. Count V must be dismissed.

## V. BREACH OF DUTY OF FAIR EVALUATION

General Aviation alleges in Count VII that Cessna breached its duty to exercise ordinary care in the evaluation of General Aviation's sales performance. This claim is in the nature of a tort action. The Court acknowledges that under Michigan law, a duty to exercise reasonable care may arise out of a contract. *Schipani v. Ford Motor Co.*, 102 Mich.App. 606, 624, 302 N.W.2d 307 (1981). Negligent performance of a contractual duty may constitute a tort as well as a breach of contract. *Id.* However, a tort action will lie only if a relation exists which would give rise to a legal duty distinct from duties imposed by the contract itself. *Nelson v. Northwestern Savings & Loan Ass'n*, 146 Mich.App. 505, 509, 381 N.W.2d 757 (1985).

█ Here, the duty asserted proceeds directly and exclusively from ¶ A.3. of the

Agreement, regarding evaluation by "reasonable criteria." It does not arise from any relation between the parties distinct from the contract. General Aviation has not here asserted the existence of a legal duty which could not be fulfilled by enforcement of the contract itself. For if Cessna had terminated the Agreement prematurely based on evaluation of General Aviation's performance, it would have been obliged, under the Agreement, to employ reasonable criteria in a good faith manner. The contractual duty thus offers Cessna essentially the same protection that the duty of ordinary care would. Under these circumstances, a tort action will not lie. *Id.*

Moreover, the asserted duty of ordinary care proceeds from a provision of the Agreement which applies only to an early termination of the Agreement. See part I C of this Opinion, *supra.* Since, here, the termination of the parties' relationship is not an early termination, but is a function of Cessna's decision not to renew the Agreement upon expiration of its term, ¶ A.3. and the duties emanating therefrom are not applicable.

For these reasons, count VII must be dismissed.

## VI. UNJUST ENRICHMENT

■ Count VIII of the first amended complaint presents a claim based upon the equitable doctrine of unjust enrichment. This claim asks the Court to impose a "contract-in-law" to prevent unjust enrichment of Cessna. The essential elements of such a claim are (1) receipt of a benefit by Cessna from General Aviation, and (2) which benefit it is inequitable for Cessna to retain. *City of Detroit v. State of Michigan,* 594 F.Supp. 574, 577 (E.D.Mich.1984); *In Re: McCallum Estate,* 153 Mich.App. 328, 335, 395 N.W.2d 258 (1986); *Hollowell v. Career Decisions, Inc.,* 100 Mich.App. 561, 570, 298 N.W.2d 915 (1980).

It appears that when Cessna terminated the distributorship relationship, it refused to repurchase any of the repair parts inventory which General Aviation had accumulated for the purpose of servicing Cessna aircraft. These parts are alleged to have a current value of $276,306.45. General Aviation purchased the parts inventory from Cessna for the sole purpose of discharging its responsibilities under the 1984 Sales and Service Agreement, ¶ B.3. For Cessna to require General Aviation to purchase the parts and accept payment therefor, and then to suddenly terminate the relationship without repurchasing remaining parts is said to constitute unjust enrichment.

Cessna argues the Court should not impose an implied-in-law contract where the parties have entered into an extensive contractual agreement which specifically omits any promise to repurchase inventory. The argument would be more persuasive if the Agreement spelled out the rights of the parties with respect to the parts inventory, for clearly, the Court is loath to rewrite a contract term expressly agreed to. But here, on this issue, the Agreement is silent. This silence is noteworthy in view of the fact that prior Agreements between the parties specifically provided for repurchase of the parts inventory at General Aviation's option. Furthermore, evidence is presented suggesting the "promise to repurchase" provision was deleted from the 1984 Agreement by Cessna without negotiation and without specific notice to General Aviation.

Under these circumstances, the Court is unwilling to rule as a matter of law that Cessna's refusal to repurchase the parts inventory is or is not so inequitable as to warrant imposition of an implied-in-law contract. There remain genuine issues as to material fact, to wit: (1) the knowledge and communications of the parties surrounding the deletion of the "promise to repurchase" clause; (2) the value of the parts inventory in General Aviation's hands after termination of the distributorship relationship; and (3) the existence of any legitimate business reasons for Cessna's refusal to repurchase. Accordingly, the unjust enrichment claim presented in count VIII survives the motion for summary judgment.

## VII. CONCLUSION

Pursuant to Cessna's motion for summary judgment, the Court has evaluated the legal and factual support for each of Gen-

eral Aviation's remaining claims. Based on the foregoing reasoning, the Court finds Cessna is entitled to summary judgment as to the claims stated in counts I, II, III, IV, V, and VII. As to the claim stated in count VIII, the motion for summary judgment must be denied.[11] An order consistent with this Opinion shall issue forthwith.

**11.** The claims stated in counts VI and IX were dismissed by earlier order of the Court.